UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MICHELE OSBORN,                    :
     Plaintiff,                    :
                                   :    Case No. 05cv1673 (JBA)
v.                                 :
                                   :
HOME DEPOT U.S.A., INC.,           :
     Defendant.                    :

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 43]

Plaintiff Michele Osborn brought this suit against her
current employer, defendant Home Depot U.S.A., Inc. ("Home
Depot"), alleging unequal pay on account of her gender in
violation of the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206;
Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et
seq.; and the Connecticut Fair Employment Practices Act
("CFEPA"), Conn. Gen. Stat. § 46a-60 et seq.  Defendant moves for
summary judgment on the grounds that the wage differences
complained of by plaintiff were based on factors other than sex,
which explanation plaintiff cannot prove is pretextual, and that
plaintiff cannot prove discriminatory animus for the purposes of
her Title VII and CFEPA claims.  For the reasons that follow,
defendant's Motion is DENIED.

## I.   Factual Background

On November 16, 2002, plaintiff Osborn was hired as a "sales
associate," a.k.a. "kitchen designer," at a rate of $12.50 per
hour at the Home Depot in Bloomfield, Connecticut.  (Pl. 56(a)(2)

1

¶¶ 1, 5.)  She described her job responsibilities as follows:

> We explain the different cabinet companies, different
> types of woods that you could use, . . . go along with
> a budget that you want . . . We recommend that you get
> a site evaluation so that we can have our measurer go
> out and measure your kitchen.  And then at that point
> the measurer, if they choose to do that option, they go
> out and measure it and it comes back into the store and
> at that point we design it into the system and then we
> call the customer to come in and review what we've put
> in.
>
> . . .
>
> Once the customer makes a decision, . . . [we] design[]
> the kitchen for them . . . [u]sing the 20/20 [computer
> program].

(Osborn Dep. at 32-33.)  Her job as a kitchen designer fell

within the general ambit of "sales associate," a position whose

two primary duties were to: "(a) provide outstanding customer

service to our Customers and (b) drive the sales and

profitability of the store" (Job Description, Pl. Exs. H, I).

When Osborn applied for a position with Home Depot, she

represented on the job application that she had a high-school

education and had previously worked as a FedEx courier, a bus

driver, a treasurer's aide, and a Dial-a-Ride coordinator.  (Id.

¶ 2.)  During her interview a few days later, Osborn supplemented

her application with a copy of her résumé, which further

represented that she had worked for more than a decade at

Suffield Bank, including serving as branch manager.  (Pl. Aff. I,

Pl. Ex. B, ¶¶ 2-5; Pl. Dep. at 28-29.)  The salary she earned

immediately prior to working for Home Depot was $14.93 per hour.

(Def. Rule 56.1 Statement ¶ 4.)

The parties have focused on two other Home Depot employees also employed as kitchen designers. Michael Fournier, who held an associates degree in visual communication and illustration and had been earning $24 per hour in his previous position (id. ¶ 8), was hired on March 8, 2003 at a starting wage of $18 per hour (id. ¶ 6). He worked in this capacity and without a raise in pay until his resignation on November 24, 2003. (Id. ¶ 10.) James MacDonald was employed in the same capacity from November 2003 until January 2005, and earned the same $18 hourly wage. (Id. ¶¶ 11, 16.) His application reflected some college education and 27 years' experience as a database consultant; in his previous job, he had been earning $32.00 per hour. (MacDonald Application, Pl. Ex. A.)

On the checklist of "work skills" included in the Home Depot application, Osborn marked several options: cash register, computer, word processor, paint, and calculator. (Pl. Application at 2, Def. Ex. A.) Fournier, whose application was submitted for several jobs, checked the following: cash register, computer, hardware, word processor, other—kitchen design, lumber, power tools, PC, plumbing, fork lift, software apps, electrical, and calculator. (Fournier Application at 2, Def. Ex. A.) MacDonald also applied for a number of different positions and marked the following skills: power tools, plumbing, painting,

electrical, hand tools, lawn equip. sales, cash register, hardware, computer, and general sales. (MacDonald Application at 2, Def. Ex. A.)

After being hired, Osborn, Fournier, and MacDonald were all required to participate in a mandatory six-week training course taught by Richard Bukowski, a Home Depot Divisional Field College Trainer specializing in kitchen and bath design. Bukowski testified that plaintiff underperformed as compared to other hires in the training class he led: she "struggled with the course work and repeatedly held the rest of the class back due to her lack of experience and the difficulty she exhibited in comprehending the course materials with the same level of success as the rest of the associates in her class." (Bukowski Aff., Def. Ex. 1, ¶ 4.) He observed that she "[d]id not have any background in Kitchen Design or computerized design." (Id. ¶ 5.) He also stated that Fournier and MacDonald "attended the same set of training courses [and] excelled during class because of their vast prior experience in kitchen cabinetry business and/or computerized design." (Id. ¶ 8.)

Osborn stated in her October 12, 2006 affidavit that sometime before Fournier left Home Depot at the end of 2003, he told her that he had been making $16.00 per hour, although she later found out that he was making $18.00 per hour. (Pl. Aff. I, Pl. Ex. B, ¶ 19.) She complained shortly thereafter to then-

4

store manager Galen Greer, who assured her that he would consult with then-district manager Greg Maybech. (Id. ¶ 20.) Sometime during MacDonald's employment, plaintiff learned he was being paid $18.00 per hour and complained about this to then-assistant store manager Michelle Mayhew, who referred plaintiff to Greer. (Id. ¶¶ 24, 25.) Plaintiff claims that she complained to Greer a second time, but that neither he nor Maybach provided her with any response. (Id. ¶ 26.) In Osborn's second affidavit, dated June 20, 2007, she adds that she complained to Mayhew about her alleged undercompensation throughout 2004 "as each month's sales performance statistics were published." (Pl. Aff. II, Pl. Supplem. Mem., ¶¶ 17, 19, 20.)

In June and September 2003, plaintiff was named Sales Associate of the Month and received a $75.00 bonus on each occasion. (Id. ¶ 5.) In February 2004, plaintiff received five Merit Badges and received a $100.00 bonus. (Id. ¶ 10.) Osborn received annual salary increases in 2004 through 2007, and in 2004 achieved sales of $256,710, as compared to MacDonald's $142,539. (Id. ¶¶ 9, 14, 15, 23, 24.)

Monique Egan, who worked as Human Resources Manager at the Bloomfield store from January 2003 to April 2006 and was responsible for "selecting and interviewing store associates including Kitchen Designers . . . and administering the wage process and review process," opined that Fournier and MacDonald

"had significantly more and relevant qualifications, skills and experience when they were hired than Plaintiff had." (Egan Aff., Def. Ex. 2, ¶¶ 1-3.) Egan viewed Fournier as having had ten years of experience in graphic design and cabinetry (id. ¶ 4) and MacDonald as having 27 years of relevant experience — in computer programming/design, systems analysis, and business — as well as two years of college (id. ¶ 5).

When Fournier and MacDonald were hired in 2003, kitchen designer Darlene Tardiff was the head of the Bloomfield branch's kitchen design department. (Tardiff Dep. at 85.) She has worked for Home Depot since 1998, when she was hired at $12 per hour, coming to the job without "any background" or "any clue what kitchen design entailed." (Id. at 20, 24.) Tardiff began her career with defendant at the Enfield, Connecticut location, where, six months into the job, she learned that two male kitchen designers — Farrell and D'Amico — had been hired at a higher hourly wage than she. (Id. at 24-27.) She brought this concern to the attention of the store manager Greg Assarian and asked him for a raise, which was granted thereafter in the amount of $2 per hour. (Id. at 26, 28.) Within two years on the job, Tardiff's salary went up by a total of $5 per hour. (Id. at 24.)

It was Tardiff who, personally acquainted with plaintiff, encouraged her to apply for the job and describes Osborn as "an exemplary employee." (Id. at 53.) Tardiff had no involvement in

the hiring of plaintiff, Fournier, or MacDonald, but became acquainted with all three once they were kitchen designers. With respect to Fournier, Tardiff stated that "[he] was familiar with the CAD system before he was hired" and did not need to complete the full six-week training. (Id. at 67.) Tardiff called his designs "beautiful," but opined that they were often too elaborate for many customers' budgets, although Fournier met his sales goals. (Id. at 80-81.) Tardiff stated that Fournier did not always meet her expectations as an employee but that Osborn did (id. at 83), even though "Fournier had superior job knowledge to Michele Osborn" (id. at 84). Tardiff stated in her deposition that she was dissatisfied with MacDonald's job performance, particularly his ability to deal with customers. (Id. at 88.)

Details about two other employees are also part of the record: Emaley Losic, a woman who defendant contends was hired as a kitchen designer at a wage above Fournier and MacDonald's, and David Irwin, a kitchen designer who began at a wage lower than plaintiff's starting salary. In August 2003, Emaley Losic was hired at $18.35 per hour (Egan Aff. ¶ 10.), although it is disputed whether her title was "kitchen designer" as defendant contends, or "interior designer" as noted by defendant on Losic's completed application (Losic Application at 2, Def. Ex. E). Losic completed some college and had worked as associate manager of a Pier 1 Imports branch, assistant manager of a Sherwin

Williams branch, and sales designer at a furniture store before coming to Home Depot. (Id.)  On her application, Losic checked the following skills: cash register, paint, word processor, other—interior design, computer, PC, and calculator. (Id.)

## II. Discussion

### A. Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-1061 (2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).  "The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Id. (citations omitted).  "If reasonable minds could differ as to the import of the evidence .

. . and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain [] summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations, alterations and quotations omitted).

**B.    EPA Claims**

**1.    Legal principles**

The EPA requires that employees, regardless of gender, be paid equally for "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). To prove an EPA violation, the plaintiff must first establish a prima facie case of discrimination by showing (1) that the employer pays different wages to employees of the opposite sex; (2) that the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) that the jobs are performed in similar working conditions. Ryduchowski v. Port Auth. of N.Y. & N.J., 203 F.3d 135, 142 (2d Cir. 2000); Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999); Aldrich v. Randolph Centr. Sch. Dist., 963 F.2d 520, 524 (2d Cir. 1992). Under the EPA, as compared with Title VII, a plaintiff need not establish that the employer acted with "discriminatory intent"; rather, the EPA "creates a type of strict liability."

Ryduchowski, 203 F.3d at 142 (citation and quotation marks omitted).

Once the plaintiff has made out her prima facie case, the burden of persuasion shifts to the defendant to prove that the pay disparity is justified by one of four affirmative defenses: a "seniority system"; a "merit system"; an earnings system based on "quantity or quality of production"; or some other, non-gender-based factor implemented for "a legitimate business reason." Belfi, 191 F.3d at 136; 29 U.S.C. § 206(d)(1). The four statutory defenses are to be narrowly construed, however, and thus an employer faces a heavy burden in rebutting the plaintiff's prima facie showing. Ryduchowski, 203 F.3d at 143. The plaintiff may counter the employer's claimed defenses "by offering evidence showing that the reasons sought to be proved are a pretext for sex discrimination." Aldrich, 963 F.2d at 526. The question, then, is whether the justifications advanced by the defendant were "'used . . . reasonably in light of the employer's stated purpose as well as other practices.'" Id. (quoting Maxwell v. City of Tucson, 803 F.2d 444, 446 (9th Cir. 1986)).

### 2. Home Depot's asserted justification

For the purposes of its Motion, Home Depot assumes that Osborn can establish her prima facie showing of sex discrimination under the EPA by proving that she was paid less than Fournier and MacDonald for performing similar work under

similar conditions.  (Def. Mem. in Supp. at 7.)  Therefore, it is
the defendant's burden to show that there is no disputed issue of
material fact with respect to its claimed justification for the
pay differential.  Citing the fourth statutory affirmative
defense, Home Depot contends that "the pay difference amongst
Bloomfield store Kitchen Designers was based on factors other
than sex (namely, qualifications, work experience, education and
market forces)."  (Def. Reply at 7.)

    At all relevant times, Home Depot has used a document
entitled "Determining Pay Rates for New Hires" to set employees'
initial salaries.  (Egan Dep. at 34-35.)  Among the guidelines
set out in this document were categories based on years of
relevant experience.  Once a person is hired, the company uses "a
[biannual] review cycle set up based on hire date" for hourly
associates and any raise is awarded "using charts and percentages
based on where they do fall in the percentile that they're in and
what percent, . . . It's very regulated, and it's a company
standard for what they try to do to make sure that it's across
the board on how they distribute the money."  (Id. at 31, 32.)

    When Egan hired Fournier, she assessed his background as
"extensive" and believed "that he had a high skill level and he
was bringing a lot to the Home Depot," with which then store
manager Steve Rooney agreed.  (Egan Dep. at 70-71.)  She stated
that she set his wage "by utilizing the company standard

information based on his experience . . . [and] [b]y utilizing the determining pay rate for new hires." (Id. at 71.) Egan explained her process in hiring Fournier: she "utilized his application" but also relied on the interview "because not everything is going to be on his application, based on other things that he said, he was very professional, well spoken, very well dressed." (Id. at 73.) "Fournier has education, specifics to graphic design in the computer. He has worked as a graphic designer, and he specifically mentioned 20/20, which is a generic kitchen design class and utilized throughout the United States. He was also a business owner and a cabinet maker." (Id. at 75.) In assessing his previous work experience at Barco Graphics, Egan found the design aspect relevant to his prospective job at Home Depot. (Egan Dep. at 82-83.)

MacDonald's application stated that he had some college education and had worked for 27 years as a "database consultant" for the insurance company CIGNA. (MacDonald Application at 2, Def. Ex. A.) Egan was impressed by his 27 years of experience in computer programming and systems analysis, as reflected by the margin notes she made on his application form. (Id.; Egan Dep. at 125.) Based on Fournier and MacDonald's stated employment experience, Egan determined that they each had over ten years of relevant experience and used defendant's established, systematic salary determination scale to arrive at a wage of $18 per hour.

12

Additionally, market forces, previous experience, education, and inducement to hire the best person for the job have been held to be legitimate factors justifying pay differentials under the EPA. See Ottaviani v. State Univ. of N.Y., 679 F. Supp. 288, 338-39 (S.D.N.Y. 1988); see also Mazzella v. RCA Global Commc'ns, Inc., 642 F. Supp. 1531, 1552 (S.D.N.Y. 1986). Defendant asserts that the higher wage offered to Fournier and MacDonald was in part designed to incentivize their accepting a job with Home Depot. Egan stated that because Fournier and MacDonald "had substantial experience and earned approximately $24 and $32 per hour respectively in their previous positions. . . . Home Depot was required to pay them close to the top of the scale in order to obtain their services." (Egan Aff. ¶ 7.)

Notwithstanding the extensive evidence available at this stage of the litigation, Home Depot's burden under Rule 56 and the EPA is not insubstantial. For summary judgment to be appropriate, Home Depot must show that no genuine issue of material fact exists as to a critical question: whether the asserted justifications for the initial and ongoing pay disparity between Osborn and her male peers are legitimate. Home Depot must demonstrate that no reasonable jury could disagree with its contentions that Osborn was paid a wage commensurate with her experience and skills as compared with the other kitchen designers. Even if Home Depot meets its burden of establishing

its affirmative defense, the evidence must also be such that no reasonable fact-finder could credit the inferences Osborn urges from the evidence that pretext may be inferred from the circumstances.

Osborn argues that Home Depot disregarded her extensive sales experience and that her work history and qualifications were not so different from Fournier's and MacDonald's to justify their nearly 50% pay differential. Specifically, she argues that MacDonald's computer work for CIGNA was not relevant to the position of kitchen designer, and that Fournier's design background was not readily transferrable given the sales-oriented nature of his Home Depot job. Osborn testified that she had described at her job interview the sales skills she had acquired from working for Tupperware "and through [her] 14 years of banking" (Pl. Dep. at 28), but defendant ignored the relevance of this experience while attributing relevance to Fournier's design background or MacDonald's work with computers.

In weighing an employer's asserted defense against the employee's arguments in response that the justifications are a pretext for sex discrimination, "[t]he appropriate inquiry to determine . . . whether the employer has used the [justification] reasonably in light of the employer's stated purpose as well as its other practices." Aldrich, 963 F.2d at 526 (internal quotation marks omitted). As the Second Circuit has explained,

"[c]ircumstantial evidence in the form of [competing explanations] raise questions of fact to rebut [an employer's] alleged non-discriminatory reasons for [a] wage disparity, and may provide the jury with a basis to find pretext." Belfi, 191 F.3d at 139. In Belfi, the plaintiff-employee claimed that the salary plan used by her employer to set wages had been applied inconsistently and unfairly to her. Id. at 132-133. In reversing the district court's entry of summary judgment in favor of the defendant-employer, the panel concluded:

> [W]here there is a discrepancy in wages and the employer offers its established policy as an explanation, inquiry must focus on whether that policy has been used reasonably in the case at hand, in light of the employer's stated purpose for the policy and in light of the employer's other practices. Because Belfi raises genuine issues of material fact regarding the reasonableness of the LIRR's use of their policies in her case, we think a trier of fact could rationally find that gender-based discrimination was one of the motivating factors for the disparity or that the LIRR applied its policies unreasonably. Summary judgment in either circumstance is inappropriate.

Id. at 139 (citation omitted).

In this case, there are a number of critical issues still in dispute. On the present record, a reasonable fact-finder would have to resolve: What was the precise nature of Osborn's position as kitchen designer for Home Depot? What types of experiences and skills would be germane to a kitchen designer's work? To what extent was Osborn's previous experience, including her work for Suffield Bank, relevant to her work at Home Depot? To what

extent was the previous experience of Fournier and MacDonald relevant to their work at Home Depot?  Did Fournier and MacDonald have sufficiently more experience to justify being paid an hourly wage nearly 50% higher than Osborn?

As is apparent from the moving papers, these issues are certainly material to the dispute and are hotly contested.  The parties' evidence is in conflict with respect to, e.g., the requirements of the kitchen designer position (Def. Reply at 3-4; Pl. Mem. at 13), the value of Fournier's prior experience (Def. Reply at 4, 7-8; Pl. Mem. at 13-14), the value of MacDonald's experience (Def. Reply at 4, 7-8; Pl. Mem. at 15), the comparative relevance of Osborn's own experience (Def. Reply at 4-6; Pl. Mem. at 16-17), and the relevance, if any, of other employees', such as Losic's, circumstances.  (Def. Reply at 6; Pl. Mem. at 18-19).  (See also Def. Rule 56.1 Statement; Pl. Rule 56(a)(2) Statement.)

Additionally, a reasonable fact-finder could conclude on the present record that Home Depot's asserted justifications are problematic, as illustrated by three examples.  First, the defendant contends that the higher wage paid to Fournier and MacDonald "reflect[ed] the market rate Home Depot needed to pay to obtain their services for its customers."  (Def. Mem. in Supp. at 8.)  According to Monique Egan, in light of their respective experiences, "Home Depot was required to pay [Fournier and

MacDonald] close to the top of the scale in order to obtain their
services." (Egan Aff. ¶ 8.) But this economic explanation is
undermined by the fact that both men had been out of work for
quite some time. Fournier's application indicates that he had
been laid off from his previous graphic design position in
November 2001, more than a year prior to starting work for Home
Depot; that he was willing to work in any of eight categories of
positions; and that his "wage desired" was "0.00." (Fournier
Application at 1, Def. Ex. A.) Similarly, MacDonald's
application indicates that he had been out of work for nearly a
year, that he was applying for more than a dozen positions within
the store, and that he, too, was seeking no particular starting
wage. (MacDonald Application at 1-2, Def. Ex. A.) Even
supposing that the men had valuable skills germane to the work of
a kitchen designer, a jury could find Home Depot's "market rate"
explanation unconvincing and instead conclude that the market had
little if any impact on the wage necessary to attract Fournier
and MacDonald to the Bloomfield store.

Second, Home Depot also relies in part on the affidavit of
Richard Bukowski, in which he emphasized that Osborn struggled
with the kitchen designer training program. (Bukowski Aff., Def.
Ex. 1, ¶¶ 3-7.) Yet the defendant, in responding to a slightly
different point, implicitly acknowledges the problem with this
evidence: "that training was provided to all Kitchen Designers is

irrelevant, however, since the training occurred after they were hired and after their wages were set." (Def. Mem. in Supp. at 10.) A fact-finder could then rationally question how an employee's performance during a training course could bear any relationship to the determination of her initial wage, and thus whether this aspect of the rationale for Osborn's relative pay is legitimate.

As a third example, Home Depot explains the relationship between Osborn's success as a kitchen designer and her pay relative to Fournier and MacDonald thus:

> Putting aside the fact that Home Depot could have no idea how these individuals would perform when they were hired, this argument also fails for the simple fact that neither male ever received an increase in pay while Plaintiff [received three increases,] bringing her current hourly pay to $15.20 per hour, the highest pay of any Kitchen Designer in the store.

(Id. at 10 (footnote omitted).) Although Home Depot has not mischaracterized the facts, a reasonable jury could disagree with this interpretation of the evidence. Osborn received three pay raises from 2002 to 2006, but Home Depot's explanation overlooks the extent to which Osborn was still earning substantially less than the initial wage paid to the two men: the $18 per hour that Fournier and MacDonald earned on their first day was nearly 20% more than what Osborn earned after four years of good performance. Once again, a reasonable fact-finder could conclude that Home Depot's characterization of this evidence is

unconvincing.

Based on the evidence presented, Home Depot has not carried its burden of establishing its right to summary judgment as a matter of law. Genuine issues of material fact exist as to whether Home Depot's decision to initially pay and continue to pay Fournier and MacDonald substantially more than Osborn was justified by business-related and gender-neutral factors, or whether Home Depot's asserted justifications were at least in part a pretext for paying male employees more. Therefore, Home Depot's Motion for Summary Judgment on Osborn's EPA claim is denied.

### C.    Title VII and CFEPA

Plaintiff also claims wage discrimination under Title VII and the CFEPA, which unlike the EPA, require proof of intent. "The Equal Pay Act and Title VII must be construed in harmony, particularly where claims made under the two statutes arise out of the same discriminatory pay policies. . . . A key difference between them, of course, is that a Title VII disparate treatment claim requires a showing of discriminatory intent, while an Equal Pay Act claim does not." <u>Lavin-Mceleney v. Marist College</u>, 239 F.3d 476, 483 (2d Cir. 2001).

### 1.    Timeliness

Under Title VII, plaintiff had to have filed her charge of discrimination with the Equal Employment Opportunities Commission

("EEOC") within 300 days of the acts complained of; under the
CFEPA, the time limitation is 180 days for filing such a charge
with the Connecticut Commission on Human Rights and Opportunities
("CHRO").  Because plaintiff dual-filed her charge with the CHRO
and EEOC, the 300-day limitations period applies. See 42 U.S.C. §
2000e-5(e)(1); Lewis v. Conn. Dep't of Corr., 355 F. Supp. 2d
607, 616 (D. Conn. 2005) (describing the EEOC/CHRO's work-sharing
agreement).  It is undisputed that, since plaintiff filed her
CHRO/EEOC complaint on February 1, 2005, the start of the
limitations period is April 7, 2004.

    In Ledbetter v. Goodyear Tire & Rubber Co., Inc., 127 S. Ct.
2162, 2167 (2007), the Supreme Court held that actions that
merely "'carr[y] forward' the effects of prior, uncharged
discrimination decisions" and are not in and of themselves
discriminatory do not trigger the EEOC filing period.  Plaintiff
Ledbetter's Title VII claim was found to be untimely because the
paychecks received and the denied raise during the charging
period constituted "subsequent nondiscriminatory acts that entail
adverse effects resulting from the past discrimination," as
opposed to "a series of acts each of which is intentionally
discriminatory."  Id. at 2169.  The Supreme Court was careful to
explain that its holding was not intended to overturn Bazemore v.
Friday, which was distinguished on the grounds that it involved
an employer's adoption and intentional retention of a facially

discriminatory pay structure.  Id. at 2174; see 478 U.S. 385, 395 (1986) (Brennan, J., concurring in part, joined by all other members of the Court) (finding that "[e]ach week's paycheck that delivers less to a [disadvantaged class member] than to a similarly situated [favored class member] is a wrong actionable under Title VII").

Osborn argues that her Title VII and CFEPA claims are timely on two theories: first, that defendant perpetrated ongoing discrimination against her; and second, that each paycheck issued by defendant after April 7, 2004 represented a pay-setting decision notwithstanding that plaintiff complained "almost every month in 2004" after she learned that MacDonald, in addition to Fournier, was being paid more than she.  (Pl. Supplem. Mem. [Doc. # 70] at 9-10.)  In supplemental briefing, Home Depot responds that there is no evidence of discriminatory animus after April 7, 2004; that Osborn has improperly raised new allegations in opposition to summary judgment; and that Osborn failed to complain sufficiently during the liability period.  (Def. Supplem. Mem. [Doc. # 71] at 4-7.)

Although Osborn's initial hourly wage was set when she was hired in 2002, she alleged in her complaint that the gender discrimination was based on ongoing conduct which continued to the present.  The complaint charged:

> Defendant's conduct in paying Plaintiff less than men
> performing the same job was wilful in that it knew that

> it was doing so and yet failed to correct its
> discriminatory conduct. . . . Despite Plaintiff's
> demand, Defendant has failed and refused to correct its
> discriminatory behavior and continues to under pay
> Plaintiff based upon her gender.

(Compl. ¶¶ 18-19.) Citing these allegations in her supplemental briefing, Osborn explains that she "has alleged that Defendant intentionally discriminated against her on an ongoing basis when it repeatedly failed to address her complaints of unequal pay and requests for a raise to bring her wage to a fair level." (Pl. Supplem. Mem. at 6-7.) The comparative posture of Ledbetter was distinctly different. The defendant-employer in that case "contended that [plaintiff's] pay discrimination claim was time barred with respect to all pay decisions made prior to" the liability period. Ledbetter, 127 S. Ct. at 2166. There, the plaintiff "ma[de] no claim that intentionally discriminatory conduct occurred during the charging period," but rather "argue[d] simply that [defendant's] present conduct during the charging period gave present effect to discriminatory conduct outside of that period." Id. at 2169.

Significantly, Osborn, unlike Ledbetter, has claimed and offered evidence that discriminatory conduct occurred after the start of the limitations period, and so her case is distinguishable. Thus, Ledbetter presents no bar to Osborn's Title VII and CFEPA claims. As to Home Depot's other arguments, there is no evidence that any discriminatory animus which was

present prior to April 7, 2004 did not or could not continue during the liability period. And even if Osborn did not complain repeatedly during the relevant time period, that would not defeat her claim of pay discrimination if she nevertheless establishes facts from which a jury could reasonably infer discriminatory intent. The evidence is disputed as to whether she "complained virtually every month in 2004" (Pl. Supplem. Mem. at 10; see Def. Supplem. Mem. at 7), but the parties agree that Osborn complained at least once to an assistant store manager at some point during that year. Following this complaint, Home Depot continued to pay her $14.20 per hour throughout 2004 (reflecting her 70-cent raise as of January 2004) and until her final salary increase in January 2006, after which she earned $15.20 per hour. (Pl. Aff. I, Ex. B ¶¶ 24, 27, 32.) In other words, even after gaining four years of kitchen designer experience and demonstrating a high level of performance in the position, Osborn was rewarded with a raise to an hourly wage still substantially less than that which Fournier and MacDonald received from the beginning of their employment with Home Depot. As is critical to the issue of timeliness, this pay adjustment — and any ongoing decisions to not make further adjustments — occurred within the post-April 7, 2004 liability period.

Therefore, Osborn's Title VII and CFEPA claims are timely.

### 2. Prima facie case

Turning to Home Depot's Motion for Summary Judgment on Osborn's Title VII and CFEPA claims, the record is analyzed according to the familiar McDonnell Douglas burden-shifting framework, under which Osborn must first establish a prima facie case of discrimination on account of sex.  See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).  To do so, Osborn must prove: (1) membership in a protected class; (2) qualification for her position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of membership in the protected class. See, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  "A plaintiff's burden of establishing a prima facie case is de minimis."  Abdu-Brisson v. Delta Airlines, Inc., 239 F.3d 456, 467 (2d Cir. 2001).

It is undisputed that Osborn can prove the first, second, and third prongs: she is a woman qualified for her job as a kitchen designer, who was paid less than Fournier and MacDonald for the same work.  The only question is whether the record presents a genuine issue of disputed fact on the fourth prong of circumstances giving rise to an inference of discrimination based on sex.  "[E]vidence of disparate treatment may establish the inference of discrimination necessary to satisfy a plaintiff's

prima facie case under <u>McDonnell Douglas</u>. . . . But such evidence
is not always necessary. . . . 'A plaintiff may rely on direct
evidence of what the defendant did and said' in satisfying her
initial burden under <u>McDonnell Douglas</u>."  <u>Holtz v. Rockefeller &</u>
<u>Co.</u>, 258 F.3d 62, 77 (2d Cir. 2001) (internal citations omitted).
Here, there is no evidence of communications between coworkers
indicating an environment of sex discrimination, nor is there
direct evidence of Home Depot's intent to include gender in
gauging salary rather than using solely legitimate business
factors.  Nevertheless, Osborn has sustained her prima facie
burden under Title VII and CFEPA, for just as a jury could infer
under the EPA that Home Depot's asserted justifications were
pretextual, so, too, could a jury infer discriminatory animus
from the factual record for the purpose of Title VII and CFEPA.
Although disputed, the evidence is not such that no reasonable
fact-finder — looking to the magnitude of the pay differential,
the fact that the higher-earning Fournier and MacDonald were
male, the circumstances explaining the disparity, and their
comparative job success — to draw an inference of gender
discrimination.

    It is not entirely clear from the moving papers whether Home
Depot is merely contesting Osborn's prima facie case or is
alternatively seeking summary judgment on the basis that it has
affirmatively sustained its own burden under <u>McDonnell Douglas</u>

and that Osborn has made an insufficient showing in response.
(See Def. Mem. in Supp. at 11-12; Def. Reply at 9-10).  However,
to the extent the defendant contends that it has offered
legitimate business-related reasons for the pay disparity and
that Osborn has not demonstrated that these gender-neutral
justifications were actually a pretext for sex discrimination,
summary judgment is still unwarranted.  Home Depot argues that
Osborn has presented no evidence establishing that its
justifications were pretextual, but in support of this position
only restates in conclusory fashion the same arguments made with
respect to the EPA.  Specifically, defendant contends: "the same
affirmative defense of factors other than sex that applies to
[Osborn's] EPA claim applies here" (Def. Mem. in Supp. at 12);
"Plaintiff's opposition fails to even argue that Defendant's
proffered legitimate reasons were a pretext" (Def. Reply at 9);
and "no rational trier-of-fact could find that Home Depot's pay
differential . . . was based on sex discrimination" (Def. Mem. in
Supp. at 12).  With no additional evidence accompanying them,
these arguments with respect to Title VII and CFEPA are
unavailing.

As explained above, Osborn has presented evidence from which
a rational fact-finder could infer that Home Depot acted with
discriminatory animus and that its explanations for the wage
disparity were only a pretext for paying Osborn less due, at

least in part, to her sex.  Therefore, summary judgment on her Title VII and CFEPA claims is inappropriate.

**III. Conclusion**

Accordingly, defendant's Motion for Summary Judgment [Doc. # 43] is DENIED.

IT IS SO ORDERED.

/s/_____

JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 19th day of September, 2007.**